564 A.2d 812

**In re Rosa A. RIDDLEMOSER.**

**No. 17, Sept. Term, 1989.**

Court of Appeals of Maryland.

Oct. 17, 1989.

Barbara Novak (William G. Kolodner, P.A., Bernard Greenberg, all on brief), and Ellen Stoffer, Baltimore, for appellant.

J. Joseph Curran, Jr., Atty. Gen., Ralph S. Tyler, Jack Schwartz, Asst. Attys. Gen., Baltimore, for State of Md., amicus curiae.

M. Rose Gasner and Fenella Rouse, Richard Wasserman, Sinnreich & Wasserman, New York City, and Robert J. Ryan and Moore, Carney, Ryan & Lattanzi, Baltimore, for Soc. for the Right to Die, Inc., amicus curiae.

Varda N. Fink, Carolyn Jacobs, Baltimore, for Johns Hopkins Health System Corp., Johns Hopkins Hosp., Francis Scott Key Medical Center, Homewood Hosp. Center, John R. Metz and Piper & Marbury of Baltimore, for Bon Secours Extended Care Facility, Bon Secours Hosp.,

Carroll County Gen. Hosp., Caroline Nursing Home, Children's Hosp. and Center for Reconstructive Surgery, Peninsula Gen. Hosp. Medical Center, St. Mary's Hosp., Shady Grove Adventist Hosp., Shady Grove Nursing Center, Sinai Hosp. of Baltimore, University of Maryland Medical System and Washington Adventist Hosp., amici curiae.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, and BLACKWELL, JJ.

MURPHY, Chief Judge.

We granted certiorari in this case upon a certification of issues of law from the Court of Special Appeals, pursuant to Maryland Rule 8–304. A threshold procedural issue is whether, if the appeal is now moot, we should nevertheless address the substantive issue in the case because of the urgency of establishing a rule of future conduct. The substantive issue presented is whether circuit courts possess authority to authorize a guardian to withhold life-sustaining medical treatment from a "disabled person" in the event of cardiac arrest.

I.

Maryland Code (1974, 1988 Cum.Supp.), Title 13 of the Estates and Trusts Article is entitled "Protection of Minors and Disabled Persons."[1] Section 13–105(b) provides that circuit courts "have exclusive jurisdiction over protective proceedings for disabled persons." Section 13–101(d), together with § 13–201(c)(1), defines a "disabled person" in part as one, other than a minor, who has been judged "by a court to be unable to manage his property ... and affairs effectively because of physical or mental disability, senility, or other mental weakness, disease, habitual drunkenness, addiction to drugs, imprisonment, compulsory hospital-

---

1. All section references unless otherwise indicated are to the Estates and Trusts Article.

ization, confinement, detention by a foreign power, or disappearance." *See also* Maryland Rule R70(b).

Sections 13–704 through 13–710 are codified within Subtitle 7 (Guardian of the Person) of Title 13. Part II thereof, entitled "Disabled Persons," provides in § 13–704 that the court "may superintend and direct the care of a disabled person, appoint a guardian of the person, and pass orders and decrees respecting the person as seems proper, including an order directing the disabled person to be sent to a hospital." Section 13–705 authorizes the court to appoint a guardian of a disabled person when it finds

"from clear and convincing evidence that a person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person, including provisions for health care, food, clothing, or shelter, because of any mental disability, senility, other mental weakness, disease, habitual drunkenness, or addiction to drugs, and that no less restrictive form of intervention is available which is consistent with the person's welfare and safety."

Section 13–708(a) provides that the court "may grant to a guardian of a person only those powers necessary to provide for the demonstrated need of the disabled person." Section 13–708(b) provides that, subject to the limitations of subsection (a), "the rights, duties, and powers which the court may order include ... (8) The power to give necessary consent or approval for medical or other professional care, counsel, treatment, or service, except that the court must authorize any medical procedure that involves a substantial risk to life."

## II.

On August 19, 1985, the Circuit Court for Baltimore City (Kaplan, J.) found Rosa A. Riddlemoser to be a "disabled person" under the pertinent provisions of the Estates and Trusts Article. Judge Kaplan subsequently appointed William J. Kolodner as guardian of Riddlemoser's property and co-guardian of her person, together with the Executive

Director of the Baltimore City Commission on Aging and Retirement Education. The guardians were thereby authorized "to consent to medical or other professional care, counsel, treatment, or service ... except that this Court must authorize any major surgery or any other medical procedure that involves a substantial risk to the life of the disabled."

On November 1, 1988, Riddlemoser was admitted in a comatose condition to Union Memorial Hospital in Baltimore. She had suffered a stroke which caused her to lose control of her bodily functions; she had to receive nutrients from a gastric feeding tube. Prior to her admission to the hospital, Riddlemoser had been living in her apartment under around-the-clock supervised nursing care. On November 2, 1988, Dr. Edwin Berstock, Mrs. Riddlemoser's treating physician, recommended that, because of her extremely bad prognosis, no "aggressive heroic measures" be undertaken in the event she were to suffer cardiac arrest.

Counsel was appointed for Riddlemoser on November 4, 1988. That same day, the guardians petitioned the Circuit Court for Baltimore City for an order that cardiopulmonary resuscitation and/or other life prolonging medical treatments be withheld should cardiac arrest take place.

A hearing was held before Judge Thomas Ward on November 9, 1988 to determine whether a "Do Not Resuscitate" order should be issued in the event Riddlemoser were to suffer cardiac arrest. Dr. Berstock testified that Riddlemoser was suffering from cerebrovascular thrombosis (a blood clot within a vein in the brain) which was caused by two strokes, one in August 1985 which rendered her disabled, and one in November 1988. A Computerized Axial Tomography (CAT) scan performed on Riddlemoser showed that she had suffered "massive intra-cerebral hemorrhaging." The doctor also testified that as a result of the strokes, her brain had been "effectively destroyed" and that she would not regain consciousness. A neurologist and neurosurgeon had also examined Riddlemoser and they concurred with Dr. Berstock's opinion. Additionally, Dr.

Berstock testified that in his opinion attempted cardiopulmonary resuscitation would be "inhuman." [2]  At the conclusion of the hearing, Judge Ward declined to issue the order. He stated that whether the relief sought by the guardians should be granted was "not properly before this court," thereby indicating his belief that he lacked authority to issue the order.[3]

Mrs. Riddlemoser's counsel and her guardians appealed to the Court of Special Appeals.  Prior to oral argument in that court, Riddlemoser died when she suffered cardiac arrest and could not be revived.  As earlier observed, the Court of Special Appeals, notwithstanding Riddlemoser's

---

**2.** The procedures involved in cardiopulmonary resuscitation were vividly described in *Matter of Dinnerstein,* 6 Mass.App.Ct. 466, 380 N.E.2d 134, 135–36 (1978), as follows: "Such efforts typically involve the use of cardiac massage or chest compression and delivery of oxygen under compression through an endotracheal tube into the lungs.  An electrocardiogram is connected to guide the efforts of the resuscitation team and to monitor the patient's progress.  Various plastic tubes are usually inserted intravenously to supply medications or stimulants directly to the heart.  Such medications may also be supplied by direct injection into the heart by means of a long needle. A defibrillator may be used, applying electric shock to the heart to induce contractions.  A pacemaker, in the form of an electrical conducting wire, may be fed through a large blood vessel directly to the heart's surface to stimulate contractions and to regulate beat. These procedures, to be effective, must be initiated with a minimum of delay as cerebral anoxia, due to a cutoff of oxygen to the brain, will normally produce irreversible brain damage within three to five minutes and total brain death within fifteen minutes.  Many of these procedures are obviously highly intrusive, and some are violent in nature.  The defibrillator, for example, causes violent (and painful) muscle contractions...."

**3.** In denying the request to withhold cardiopulmonary resuscitation Judge Ward said: "I do not think that is up to judges to decide life and death and a decision on behalf of the guardian and family not to ask a judge's approval as to what you are going to do on the basis of Mr. Curran's [The Attorney General of Maryland] recent fresh decision....  You know this matter is before the legislature on the whole issue of life support and the legislature has not authorized anything and remains silent.  In reference to [§ 13–708(b)(8) ] it would be a good idea to start a full procedure in this state of Maryland to determine whether a patient's life is not based on the testimony in a courtroom."

death, certified the important issue of law for our considera-
tion.

### III.

Counsel for Riddlemoser, her guardians and a number of
amici curiae (the State of Maryland, the Society for the
Right to Die, Inc., and a substantial group of health care
providers), urge us to decide the substantive legal question
of whether the circuit court, under § 13–708(b)(8), had au-
thority to authorize the guardians of Riddlemoser's person
to withhold life-sustaining medical treatment. While recog-
nizing that the appeal is moot in view of Riddlemoser's
death, they correctly point out that we possess constitution-
al authority to decide a moot case, citing *Mercy Hosp. v.
Jackson*, 306 Md. 556, 562, 510 A.2d 562 (1986). *See also
Robinson v. Lee*, 317 Md. 371, 564 A.2d 395 (1989) and *State
v. Peterson*, 315 Md. 73, 82–85, 553 A.2d 672 (1989). They
urge that we exercise this authority because an expression
of our views is of vital importance to the public interest.

A question is moot if, at the time it is before the
court, there is no longer any existing controversy between
the parties. *See Mercy Hosp., supra*, 306 Md. at 562, 510
A.2d 562; *Attorney Gen. v. A.A. School Bus*, 286 Md. 324,
327, 407 A.2d 749 (1979); *State v. Ficker*, 266 Md. 500,
506–07, 295 A.2d 231 (1972); *Lloyd v. Board of Supervisors
of Elections*, 206 Md. 36, 39, 111 A.2d 379 (1954). We have
said time and again that courts do not sit to give opinions
on abstract propositions or moot questions; appeals which
present nothing else for decision are dismissed as a matter
of course. *Ficker, supra*, 266 Md. at 506–07, 295 A.2d 231;
*Potts v. Governor of Maryland*, 255 Md. 445, 449, 258 A.2d
180 (1969); *Washburne v. Hoffman*, 242 Md. 519, 525, 219
A.2d 826 (1966). An exception to this rule exists "only in
rare instances which demonstrate the most compelling of
circumstances." *Reyes v. Prince George's County*, 281 Md.
279, 297, 380 A.2d 12 (1977). The "rare instances" when
the Court will express its views in moot controversies were

well articulated in *Lloyd, supra,* 206 Md. at 43, 111 A.2d 379, as follows:

"[O]nly where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions.... [I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely to prevent a decision then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight."

It is contended that all four of the *Lloyd* criteria are met and that this case presents a clear exception to the mootness rule. On the merits of the substantive question, it is urged that § 13–708(b)(8) empowers the circuit court to issue an order authorizing the withholding or withdrawal of medical treatment in the circumstances of this case.

## IV.

██ Judge Ward's refusal to authorize a "Do Not Resuscitate" order was apparently based on the language in § 13–708(b)(8) that grants the court explicit power to authorize the active administration of medical treatment, without explicitly granting power to authorize the *withholding* or *withdrawal* of medical treatment. Riddlemoser's counsel, her guardians, and amici are of one mind; they say that we should read § 13–708(b)(8) to authorize the circuit court to order the withholding or withdrawal of medical treatment.[4]

---

4. Supportive of this argument is 73 Op. Att'y Gen. (1988) [Opinion No. 88–046 (October 17, 1988) ]. It provides in pertinent part as follows: "[Section] 13–708[ (b) ](8) authorizes a guardian of the person 'to give

Whether the statute grants this authority to the court turns on the legislative intention in enacting it and, in particular, whether it is implicit from the words of the statute that the power to authorize treatment necessarily grants the power to withhold or withdraw treatment.[5] The matter is one of interpretation which, arguably, may not be free of conflicting views. In this regard, because Riddlemoser's counsel, her guardians and amici all argue for the same interpretation of § 13–708(b)(8), and there is no party presenting a contrary argument, we lack an adversarial contest on the legislatively intended reach and meaning of the statute's provisions.

As we said in *Reyes, supra,* 281 Md. at 283, 380 A.2d 12, "the American system of adjudication from its inception has been grounded on the principle that adversary presentation of issues actually in dispute between the parties to the suit plays a vital and essential role in attaining justice." That a full and fair presentation be made in determining the merits of a legal controversy is thus of the utmost importance, particularly in view of the *stare decisis* effect of a court's

necessary consent or approval for medical or other professional care, counsel, treatment, or service.' By necessary implication, this authority includes the power to withhold or withdraw consent to medical treatment. [Section] 13–708[ (b) ](8) cannot logically be read as authorizing only the power to consent, since 'often times a patient's interests are best served when medical treatment is withheld or withdrawn. To hold otherwise would ... reduce the guardian's control over medical treatment to little more than a mechanical rubberstamp for the wishes of the medical treatment team.' *Rasmussen v. Fleming,* [154 Ariz. 207,] 741 P.2d [674,] 688 (1987). Thus, what is contemplated is not only the power to accept medical treatment but also the power to refuse medical treatment, terminate already existing medical treatment, or choose among alternative medical treatments." Slip op. at 31.

5. We note that the power to withhold treatment and the power to withdraw treatment are separate and distinct. For example, the withholding of cardiopulmonary resuscitation is the refrainment or forbearance of possible medical treatment, whereas the withdrawal of respiratory life-support or a gastric feeding tube is the termination of already existing medical treatment. Section 13–708(b)(8) does not make these distinctions and contains no explicit standards or guidelines to be used by the circuit court when making decisions.

decision. *See Reyes, supra,* 281 Md. at 288, n. 4, 380 A.2d 12. Indeed, it is the adversarial nature of a legal proceeding that provides the necessary incentive to the parties to vigorously research the issues and present the relevant arguments that enable the court to fairly consider the merits of the controversy. *See* Note, *Judicial Determinations in Nonadversary Proceedings,* 72 Harv.L.Rev. 723, 724 (1959).

Whether § 13–708(b)(8) should be interpreted to invest the court with authority to order the cessation of life-sustaining treatment has serious implications, the positive or negative impact of which suggests the wisdom of an adversarial airing between contesting parties, which is so essential to the integrity of the judicial process. *See United States v. Johnson,* 319 U.S. 302, 305, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943). While none of the criteria set forth in the *Lloyd* case, and its progeny, which justify an appellate court to express an opinion in a moot case, speak to the need for adversarial parties, we think a lack of contesting parties is an important consideration to be weighed in applying the relevant principles. Coupled with this important consideration is the fact that, during oral argument of the case before us, we were told by counsel that Maryland trial judges, other than Judge Ward, had uniformly exercised jurisdiction on petitions by guardians seeking a withdrawal or withholding of life-sustaining medical treatment. Indeed, we were advised that Judge Ward, on an earlier occasion, had similarly so acted. While we recognize the likelihood of recurring requests for judges to exercise jurisdiction under § 13–708(b)(8), we see no urgency, as required by *Lloyd,* to establish a rule of future conduct when, as here, adversarial positions on the legal issue have not been presented, and it appears that only one state judge has declined to act on a § 13–708(b)(8) petition to withhold life-sustaining medical treatment. Moreover, in these circumstances, we entertain grave doubt that the public interest would be hurt under the *Lloyd* formulation by our refusal to express an opinion in this moot case.

APPEAL DISMISSED; COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID BY PETITIONERS.

ADKINS, J., concurs with opinion.

ADKINS, Judge, concurring.

Section 13–708 of the Estates and Trusts Article is ambiguous with respect to the power of a circuit court to authorize the guardian of a disabled person to permit the withholding of life-sustaining procedures. For the sake of disabled persons, guardians, relatives, and doctors, and for the guidance of circuit court judges, it is important that this ambiguity be resolved. Unlike my colleagues, I am not persuaded that the information now before us shows that most circuit court judges are assuming jurisdiction to decide the question posed by Mrs. Riddlemoser's guardians. The anecdotal information is at least to some degree contradicted by other, concededly equally anecdotal, information contained in the brief of Amici Johns Hopkins Health System, *et al.*

Therefore, I believe that the public interest calls for action to end the ambiguity. And I believe that the traditional criteria for addressing issues in a moot case, as set forth in *Lloyd v. Board of Supervisors of Elections*, 206 Md. 36, 43, 111 A.2d 379, 389 (1954), have, for the most part, been met. But like my colleagues, I am disturbed by the absence of robust debate as to the proper construction of § 13–708. While that circumstance would not necessarily be decisive on the question of whether we should express our views in a moot case, it is a weighty factor in this case.

When the lack of contesting positions is combined with the fact that the 1990 session of the General Assembly will soon commence, thus allowing the legislature to eliminate the ambiguity, I agree that the urgency that normally must exist if we are to speak in a moot case is not present here now. Accordingly, I concur in the result.